UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
PUES FAMILY TRUST IRA, BY MICHAEL PUES,     Index No.: 11-CV-05537
EXECUTOR OF THE ESTATE,

                                                      Plaintiff,          **PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

                                   -against-

PARNAS HOLDINGS INC. and LEV PARNAS,
INDIVIDUALLY,

                                                   Defendants.
------------------------------------------------------------------------X

       Plaintiff the Pues Family Trust IRA by Michael Pues, Executor of the Estate ("Plaintiff" or "Pues") hereby submit the following Proposed Findings of Fact and Conclusions of Law following the non-jury trial of this case held on April 27, 28, and 29, 2015.

## Findings of Fact

1.     Plaintiff is a citizen of New York. (Joint Pre-trial Statement ("JPTS"), p. 1)

2.     Defendants Parnas Holdings, Inc. and Lev Parnas ("Defendants" or "Parnas") are citizens of Florida. (JPTS, p. 1).

3.     For clarity, the following exhibits have been entered into evidence at trial and admissible for the Court's consideration:

       a. The entirety of Plaintiff's Exhibit 1, which is a set of emails between Pues and Parnas/David Correia (P. 90, L. 8 – 23).

       b. Portions of Plaintiff's Exhibit 2 marked with an asterisk, copies of David Correia's phone records from April 2011 (P. 103, L. 23-25).

       c. Plaintiff's Exhibit 3, a Subscription Booklet for Parnas Holdings, Inc. (P. 42 L. 24 – P. 43, L. 7).

d.  Plaintiff's Exhibit 3-A, the signature page contained in Plaintiff's Exhibit 3 (P. 39, L. 18 – P. 40, L. 10).

e.  Plaintiff's Exhibit 6, a bank account statement showing a transfer of $100,100 to Koala Productions, Ltd. (P. 47, L. 24 – P. 48, L. 5).

f.  Plaintiff's Exhibit 7, debit account and wire information statements showing $350,000 transferred from the Pues Family Revocable Trust (P. 66, L. 17-23).

g.  Plaintiff's Exhibit 8, a Form 1099R from Morgan Stanley Smith Barney (P. 68, L. 24 – P. 69, L. 7).

h.  Plaintiff's Exhibit 10, the Pues Family Revocable Trust Agreement (P. 63, L. 23 – P. 64, L. 7).

i.  Plaintiff's Exhibit 12, an email from Pues to Parnas regarding the $350,000 transferred (P. 80, L. 4-12).

j.  A portion of Plaintiff's Exhibit 13, the Investment Agreement signed between the parties, marked as PUES 000205-000216,(P. 305, L. 21-23).

k.  Plaintiff's Exhibit 14, a December 6, 2010 letter from Impressionist Motion Pictures, LLC to Parnas Holdings, Inc. (P. 464, L. 16-21).

l.  Plaintiff's Exhibit 16, a June 2, 2011 email from Pues to Parnas (P. 114, L. 13 – P. 115, L. 4).

m.  Plaintiff's Exhibit 17, a July 29, 2011 email from Rudy Durand to Robert Hantman (P. 115, L. 5 – 15).

n.  Portions of Defendants' Exhibit A, a copy of the Investor Agreement between the parties marked as Defendants 1-22 (P. 448, L. 10-24).

o. Portions of Defendants' Exhibit D, a Notice and/or Bill of Sale for a Motor Vehicle, Mobile Home, Off-Highway Vehicle or Vessel, marked as Defendants' 65, (P. 233, L. 19-21).

p. Defendants' Exhibit E, an email chain between Pues and Parnas and marked as PUES 000119,(P. 190, L. 6 – 16).

q. Defendants' Exhibit F, a chain of emails between Rudy Durand, Lev Parnas, and other parties, marked as PUES 000052-000056 (P. 341, L. 3-4).

r. Defendants' Exhibit G, a chain of emails between Rudy Durand, David Correia, and others, marked as PUES 000058-000062 (P. 355. L. 3-6).

s. An affidavit from Mary E. Pues affirming that Michael Pues had the authority to loan $350,000 from the Pues Family Trust to Parnas Holdings, Inc. [D.E. 44].

4. By way of brief summary, as more fully set forth herein, Plaintiff made a loan of $350,000 to Defendant Parnas Holdings, Inc., which was to be repaid to Plaintiff within 45 days in order for Plaintiff to avoid heavy tax penalties. To date, Plaintiff has not been repaid the $350,000 and as a result, Plaintiff has incurred damages. Plaintiff is seeking the repayment of this sum in addition to damages as a result of interest and tax penalties, and is entitled to judgment on the following claims: (1) Breach of Contract; (2) Fraudulent Inducement of Contract; (3) Conversion; (4) Fraud; and (5) Unjust Enrichment. (JPTS, p. 1).

5. On or around the fall of 2010, Parnas Holdings and Koala Productions Ltd. ("Koala") entered into an agreement whereby Parnas Holdings would fund up to $500,000 for the development of a motion picture originally called "Anatomy of an Assassin" later named "Memory of a Killer" (the "Movie Project"). In exchange for the $500,000 investment, Parnas

Holdings was to receive 10% or "points" in the Movie Project, the equivalent of one point for each $50,000 paid from Parnas Holdings to Koala. (JPTS, p. 2).

6. Subsequently, on November 11, 2010, Parnas and Pues met at the Millennium Hotel in New York to discuss a potential investment opportunity for the production of the Movie Project. (Pues. Day 1. Pg. 21, L. 5-10). Parnas told Pues that the Movie Project had great potential and mentioned that Jack Nicholson ("Nicholson") would be one of the featured actors. (Pues. Day 1. Pg. 24, L. 2-3). Parnas referenced Nicholson's previous film, which generated an estimate of $350,000,000, and claimed that if Pues were to own one percent of the film he would be entitled to $3,500,000. (Pues. Day 1. Pg. 24, L. 2-5). Additionally, Parnas assured Pues the Movie Project contained little risk since the script and movie rights were already secured. (Pues. Day 1. Pg. 24, L. 7-12). Parnas later explained that in order to invest in the Movie Project, Pues investment would become part of Parnas Holdings. (P. 24, L. 13-15). Pues, who relied on Parnas and trusted his judgment, agreed to invest in Parnas Holdings. (P. 23, L. 17-19).

7. On or around December 2010, Parnas arranged for Pues to meet with the producer/writer of the Movie Project, Rudy Durand ("Durand") and Nicholson at the Carlyle Hotel, located in Manhattan, New York. (P. 30, L. 1-16). After the meeting, Parnas reassured Pues of the investment, claiming they were going to have "a private jet," make "millions" and after all of the bills are paid he (Pues) would "have no problem making two million off a percentage point." (P. 32, L. 2 – 5).

8. Subsequent to the December meeting, on or around December 2010, Koala informed Parnas that an immediate payment of $100,000 was due upon signing the agreement, and the remaining $400,000 was to be payable no later than January 15, 2011. (P. 351, L. 3-9).

Failure to perform would result in Parnas losing the ability to participate in the Movie Project. (P. 326, L. 19-23).

9. Shortly thereafter, at the request of Parnas and Durand, Pues was asked to make an immediate $100,000 deposit. (P. 46, L. 13-19). Through Plaintiff's TD Bank account, Pues wired $50,100 on December 6, 2010 and $50,000 on December 16, 2010 to Koala Productions. (P. 45, L. 1-7). Upon confirmation of receipt and source of said funds, Koala accordingly recognized Pues as the party entitled to the corresponding two (2) "points" in the Movie Project and, also, to allow Pues' investment to count towards Parnas Holdings' total contractual commitment to Koala. (P. 47, L. 20 -23).

10. On or around early January 2011, Pues, Parnas and Durand had multiple conversations regarding the status of Parnas Holdings' additional payment for the remaining balance of $400,000 owing to Koala. (P. 290, L. 9 – 14).

11. As the deadline to complete funding on the Movie Project was approaching, Koala repeatedly informed Parnas that substantial performance by Parnas as to the remaining $400,000 investment was required for the Movie Project pursuant to the parties' agreement (P. 291, L. 1-3).

12. Shortly after, Durand notified Pues and Parnas that Koala needed the remaining $400,000 or Pues initial $100,000 investment would be lost due to Parnas Holding's breach of the original contract with Koala. (P. 49, L. 2-7).

13. On or around mid-January 2011, Pues and Parnas met in Florida and New York to discuss a potential loan from the Pues Family Trust to pay the remaining balance. (P. 59, L. 23-24). Parnas explained that due to his divorce, another investor becoming sick and the IRS having

temporarily frozen his assets, he would be unable to pay the remaining balance and Pues' investment was in jeopardy. (P. 50, L. 18-22).

14. Parnas and Dave Correria ("Correria), President of Parnas Holdings, asked Pues if he knew of potential investors who would want to invest in the Movie Project and fund the remaining $400,000. (P. 51, L. 20-23). Parnas or Correria later mentioned to Pues about his family trust at Morgan Stanley and the possibility of obtaining a bridge loan though the Pues Family Trust. (P. 52, L. 1-2).

15. Believing Parnas' representation that his initial investment was at imminent risk of loss, Pues spoke to his parents, and suggested that he could possibly arrange for a short-term 45-day bridge loan of $350,000 from the Pues Family Trust to Parnas Holdings. (P. 58-59, L. 23-25, 1-9). Furthermore, both Parnas and Pues agreed to obtain the final $50,000 of the agreed upon payment between Parnas Holdings and Koala through other means. (P. 81, L. 9-11).

16. On or around January 2011, Parnas and Pues made an oral agreement that the Pues Family Trust was: (1) to be repaid, in full, within forty five (45) days; (2) that in exchange for making the bridge loan and in lieu of interest, the Trust would receive an "assignment" of some number of additional "8 points" that Pues expected to be acquired by Parnas Holdings as a result of the payment of the full amount of the bridge loan proceeds to Koala; (3) repayment would cover any costs associated with the Pues Family Trust making the bridge loan; and (4) it was expressly stipulated that the bridge loan funds would only be used exclusively for the Koala investment and for no other purpose, specifically stating that the Pues Family Trust was unable and unwilling to invest any of its funds directly in the Movie Project, Parnas Holdings or Parnas, personally. (P. 58-59, L. 23-25, 1-9).

17. Subsequently, Pues informed Parnas that if he is unable to pay back the full amount within forty-five (45) days, then there would be a large tax penalty incurred to taking the funds out of the trust [bridge loan source]. (P. 61, L. 16-21).

18. Upon further negotiations, it was agreed that Parnas Holdings would provide the Pues Family Trust with an assignment of two (2) points in exchange for making the loan – in lieu of interest; which "assignment" agreement required Koala's written consent. (P. 62, L. 18-25). On or around April 2011, upon receipt of partial payment from Parnas Holdings, Koala consented to the proposed loan assignment of two (2) points in favor of the Pues Family Trust. (P. 62, L. 18-25).

19. On January 26, 2011, $50,000 was wire transferred from the Pues Family Trust, Morgan Stanley account to the beneficiary Parnas Holding. (P. 62, L. 15-23). On January 28, 2011, an additional $300,000 was wire transferred from the Pues Family Trust to the beneficiary Parnas Holding. (P. 63, L. 1-25)

20. On or around February 2011, Parnas and Pues traveled to Los Angeles, California and met with Durand at his attorney's office to execute the formal agreement of the $500,000 investment for the Movie Project. (P. 291, L. 11-15). This new investment agreement would replace the original agreement between Koala and Parnas Holdings. (P. 291, L. 11-15).

21. The new agreement (1) resolved the prior breaches between Parnas Holdings; (2) at Parnas' request, provided for a new "floor" performance commitment by Parnas Holdings to invest "no less than $250,000" in addition to the prior and restated "up to $500,000"; and (3) replaced "Ludy Killer Productions, LLC" as the successor in interest to Koala with regard to the Movie Project. (P. 300, L. 7-10). Pues was present as a witness at the execution of the agreement

between Durand (on behalf of Ludy Killer Productions) and Parnas (on behalf of Parnas Holdings). (P. 293, L. 1-4).

22. Immediately after signing the new February 2011 investment agreement, Parnas, Pues and Durand had a lunch meeting. (P. 293, L. 6-8). During this meeting, Pues asked Durand if he (Durand) had received the $350,000 that Pues had wired to Parnas Holdings. In the presence of Parnas, Durand denied receiving any further funds. (P. 293, L. 6-12).

23. Pues and Durand demanded Parnas for an explanation upon which Parnas grew angry. (P. 293, L. 6-12). Parnas told Durand not to worry about it and that he would "take care of it." (P. 293, L. 23-24). As Pues and Durand continued to question Parnas about the location of the Pues loan, Parnas angrily responded by accusing Pues of owing Parnas Holdings $1,000,000. (P. 293, L. 20-25).

24. In Pues' preliminary email to Parnas, on or around March 15, 2011 (after the scheduled due date for repayment), Pues contacted Parnas to inquire about payment for the $350,000 loan. (P. 80-81, L. 24-25, 1-4) In this email, Pues reiterates that on January 24, 2011 both parties made a verbal agreement that the loan would be paid back in forty-five (45) days beginning on January 26, 2011. (P. 80-81, L. 24-25, 1-7). Additionally, after multiple previous notifications, Pues informed Parnas that if the IRA funds were not repaid within fifteen (15) days (no later than the end of March) the Pues Family Trust estimated that they would be levied with a 10% penalty and a 38% tax liability, resulting in an additional $161,000 in penalties (constituting incurred costs and expenses associated with the Pues Family Trust making the subject loan) on top of the $350,000 principal loan amount – for a total repayment demand of $511,000. (P. 193, L. 1-15).

25. After Pues previous correspondence went unanswered, Pues via email, served a final notification to Parnas informing him that the agreed terms had not been met, and as a result, Pues would be penalized an additional $161,000. (P. 77, L. 5-19). The total outstanding amount due to the Pues Family Trust from Parnas Holding, Inc equaled $511,000. (P. 77, L. 19). As a result of Parnas' inability to satisfy the agreed upon terms, Pues informed Parnas that his continued failure to comply will result in legal action. (P. 78, L. 10-11).

26. On May 25, 2011, Correria emailed Pues informing him that Parnas wanted Pues to have in writing some sort of validation of repayment for security reasons. (P. 84, L. 24 – P. 85, L. 3). Furthermore, Correria states the terms of the loan, solidifying that Parnas Holding agreed to put up two (2) points of ownership to the Movie Project as collateral for the $510,000 owed to the Pues Family Trust. (P. 85, L. 4-8). Thereafter, Correria explains that this is the agreed amount as discussed between Pues and Parnas on a previous date. (P. 85, L. 7-8).

27. However, to date, the Pues Family Trust has yet to receive a single payment for the $350,000 loan and accumulated taxes and penalties incurred as a result of withdrawing the funds from the IRA account (P. 112, L. 12-25).

28. Pues Family Trust was further informed by Durand that, notwithstanding demands by both Pues and Koala, Parnas has continuously failed to deliver Koala the remainder of the money or return to the Pues Family Trust any of the wrongfully withheld $50,000, which was intended by the Pues Family Trust bridge loan to be used for Koala's Movie Project. (P. 607, L. 1-2).

29. There is no dispute as to whether or not Pues had the authority to deliver the $350,000 loan to Parnas. Indeed, Mary Pues, mother of Pues, and beneficiary of the Pues Family

Trust, executed an affidavit confirming that her son, Pues, had the authority to act on behalf of the Pues Family Trust. (D.E. 44).

## Conclusions of Law

### Breach of Contract

30. Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages. Fischer & Mandell LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. N.Y. 2011). See also First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998); Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996).

31. Plaintiff has established all of the elements necessary to prove its claim for breach of contract. Specifically, the parties entered into an agreement, the terms of which dictate that Plaintiff was to loan $350,000 to Parnas Holdings, Inc., and that sum was to be repaid within 45 days. Plaintiff has provided documentary evidence proving that the transfer of $350,000 was made to Defendants. Defendants, to date, have failed to make any repayments to Plaintiff. As a result of Defendants breach, Plaintiff has incurred damages.

### Fraudulent Inducement of Contract

32. "To maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract, see Van Neil v. Berger, 219 A.D.2d 811, 811, 632 N.Y.S.2d 48, 48 (4th Dep't 1995) (memorandum); see also Papa's-June Music, 921 F. Supp. at 1161 (citing cases); or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract, see Deerfield Communications Corp. v. Chesebrough-Ponds, Inc., 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986) (memorandum) (refusing to dismiss fraud claim alleging "a misrepresentation of present fact, not

of future intent" which misrepresentation was "collateral to, but which was the inducement for the contract" and thus not duplicative of contract [**22] claim) (citations and internal quotation marks omitted); Triumph Advertising, 116 A.D.2d at 527, 497 N.Y.S.2d at 675, see also Papa's-June Music, 921 F. Supp. at 1161 (citing cases); or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages, see Deerfield, 68 N.Y.2d at 956; Triumph Advertising, 116 A.D.2d at 527-28, 497 N.Y.S.2d at 675; see also Papa's-June Music, 921 F. Supp. at 1161 (citing cases)." Bridgestone/Firestone v. Recovery Credit Servs., 98 F.3d 13, 20 (2d Cir. N.Y. 1996).

33. Plaintiff has established all elements necessary to prove its claim for fraudulent inducement of the contract. The facts in this case have established that Defendants fraudulently misrepresented they were temporarily unable to fund its obligations to Koala due to Parnas' divorce, and further misrepresented that they would be able to do so at some point in the future. But for these misrepresentations by Defendants, Plaintiff would never have agreed to enter into the contract, which has resulted in damages to Plaintiff.

**Conversion**

34. In order to state a claim for conversion under New York law, a plaintiff must allege "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." Moses v. Martin, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004).

35. Further, "it is well settled that an action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a

particular manner the specific fund in question." Mfrs. Hanover Trust Co. v. Chem. Bank, 160 A.D.2d 113, 559 N.Y.S.2d 704, 712 (1st Dep't 1990); accord In re Musicland Holding, Corp., 386 B.R. 428, 440 (S.D.N.Y. 2008) (finding a claim for conversion should stand where the funds alleged to be converted "was in specific tangible funds of which claimant was the owner and entitled to immediate possession").

36. Plaintiff has established all elements necessary to prove its claim for conversion. Indeed, Plaintiff transferred $350,000 to Defendants, a transfer which was acknowledged by Defendants. This transfer was made for the purpose of having Defendants fund their obligation to a third-party. Instead, Defendants retained the funds for their own personal use, and to date, have not transferred all the funds to Koala, as understood and agreed-upon.

**Fraud**

37. In order to prove fraud, New York requires proof of the following: "misrepresentation of a material fact, falsity of that representation, scienter, reliance and damages." Mallis v. Bankers Trust Co., 615 F.2d 68, 80 (2d Cir. N.Y. 1980). See also Jo Ann Homes at Bellmore, Inc. v. Dworetz, 25 N.Y.2d 112, 119 (N.Y. 1969).

38. Plaintiff has established all elements necessary to prove its cause of action for fraud. Specifically, through the evidence submitted at trial, Plaintiff has shown that Defendants misrepresented their ability to fund their third-party obligation, and further misrepresented their ability and intention to repay Plaintiff for it, and that Defendants made these representations with the intention that Plaintiff rely on them to its detriment.

**Unjust Enrichment**

39. To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that "equity and

good conscience" require restitution. Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. N.Y. 2000). See also Dolmetta v. Uintah Nat'l Corp., 712 F.2d 15, 20 (2d Cir. 1983). The "essence" of such a claim "is that one party has received money or a benefit at the expense of another." Kaye, at 616, quoting City of Syracuse v. R.A.C. Holding, Inc., 258 A.D.2d 905, 685 N.Y.S.2d 381, 381 (4th Dep't 1999).

40. Plaintiff has established all elements necessary to prove its cause of action for unjust enrichment. Plaintiff has produced documentary evidence showing that $350,000 was loaned to Defendants (to which Defendants have also admitted). Plaintiff has also shown that these funds came directly from its own bank account and not from an outside party. Defendants have retained those funds for its own pecuniary gain, and their failure to repay or return those funds to Plaintiff has resulted in damages.

**Judgment**

41. Plaintiff is entitled to judgment in the amount of $511,000 in addition to prejudgment interest at the rate of 9% per annum, pursuant to C.P.L.R. § 5001.

**DATED** on this the 3rd day of July, 2015.

Respectfully Submitted,

/s/ Robert J. Hantman
Robert J. Hantman, Esq. (RH-3947)
HANTMAN & ASSOCIATES
1120 Avenue of the Americas, 4th Floor
New York, New York 10036
(P) 212-684-3933
(F) 646-380-3299
(C) 917-693-7444
rhantman@hantmanlaw.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

  **I HEREBY CERTIFY** that a true and correct copy of the foregoing was e-mailed and mailed on this 3rd day of July, 2015 to the following:

Richard L. Yellen
Brian C. Kombol
Richard L. Yellen & Associates, LLP
111 Broadway, 11th Floor
New York, NY 10006
(P) 212-404-6988
(F) 212-404-7857
ryellen@yellenlaw.com
bkombol@yellenlaw.com

            /s/ Robert J. Hantman
            Robert J. Hantman, Esq.