UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------x

PUES FAMILY TRUST IRA, BY MICHAEL PUES,
EXECUTOR OF THE ESTATE

                        Plaintiff,

            - against -

PARNAS HOLDINGS INC. and LEV PARNAS,
INDIVIDUALLY,

                        Defendants.

-------------------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER**
11-CV-5537 (ADS)

**A P P E A R A N C E S:**

### HANTMAN & ASSOCIATES
Attorneys for the Plaintiff
1120 Avenue of the Americas, 4th Floor
New York, New York 10036
BY:    Robert J. Hantman, Esq.,
       Shirin Movahen, Esq., of Counsel

### RICHARD L. YELLEN & ASSOCIATES LLP
Attorneys for the Defendants
111 Broadway, 11th Floor
New York, New York 10006
BY:    Richard L. Yellen, Esq.,
       Brendan C. Kombol, Esq., of Counsel

**SPATT, District Judge.**

This is a diversity jurisdiction action to recover on an alleged loan by the plaintiff

Pues Family Trust IRA (the "plaintiff" or "Trust") to the defendant Parnas Holdings Inc.

("Parnas Holdings") in the sum of $350,000. The plaintiff is seeking repayment from the

defendants Parnas Holdings and Lev Parnas ("Lev" or "Parnas" and collectively, the

"defendants") of this sum, and, in addition, the amount of certain tax penalties. The

1

plaintiff also asserts other causes of action including fraudulent inducement of contract; conversion; fraud and unjust enrichment.

In response, among other contentions, the defendant Parnas Holdings asserts that any sums paid by the plaintiff was in connection with an investment agreement and was not a loan. In addition, the defendants dispute the validity of all of the other causes of action.

## I. THE TRIAL

### A. The Plaintiff's Case

After service in the U.S. Navy, Michael Pues ("Pues") initially worked as a marble setter in the stone industry. In 1994, he started his own company, Veterans Stone, Inc. Unfortunately, Pues had an accident in June 2008. He had three surgeries and was out of work to 2011. In October 2010, he met the defendant Lev Parnas. Lev introduced himself to Pues as the "youngest stock broker out there." Lev stated that his clients never lost any money and that he would "take care of all my investments." (Tr. at 13). Lev was a broker for a firm called Mammoth Bullion, a company that bought and sold precious metals. Lev helped Pues with his investments and Pues trusted him.

At an unstated time, Pues was invited to Florida by Lev. While in Florida, Lev and David Correia took him out to a golf club in Boca Raton. Apparently Lev became the adviser and broker for Pues, and thereafter, Lev opened an investment account for Pues and his brother and another friend and pooled their money together to invest $260,000 in Lev's medical connections company. Lev told Pues that he would "basically double my money." (Tr. at 18).

2

In November 2010, Pues met with Lev at the Millennium Hotel in New York and they discussed an investment in a movie, a hotel, and other investments. Pues testified that, at that time, Lev was his investment adviser and his broker. Lev told Pues that he was successful as an investment adviser "since he was 18" and was "driving around in a Bentley" and never lost money for any of his clients. (Tr. at 23). Pues testified that he relied on Lev and trusted him.

In November 2010, Lev also spoke to Pues about a movie deal. As a result of his accident, Pues had financial difficulties and was having problems raising his three teenage children. However, Lev gave him an exclusive opportunity to invest in this movie deal. Lev told Pues, "I'm tied with him. I'm family. I'm secured with that . . .." (Tr. at 25).

In December 2010, Lev was back in New York and spoke to him about the investment in the movie. Lev said that he would not have to put any money in the venture because, "I'm family." At that time, Pues met with Rudy Durand of Koala Productions who wrote up an agreement for Pues to invest in his company, Koala Productions. The defendant was going to give Pues an opportunity to invest in Koala Productions.

At that time, Pues was living on receivables coming in and the savings from the house he sold in 2010. As of 2010, Pues had three children, 16, 14 and 12 years of age. Clearly, Pues was having financial difficulties and Lev gave him the exclusive opportunity to invest in the movie deal that, according to Lev, would provide him with "a substantial amount of return," (Tr. at 28); so that he could pay for his childrens' college tuition.

3

At the end of 2010, introduced by Lev Parnas, Pues met with Rudy Durand at the Carlyle Hotel, in New York City, in order to invest in the movie business. He had no prior experience in investing in movies. He went to dinner with Durand. Jack Nicholson was also at the dinner. Pues was very impressed. The defendant told him that he will make a lot of money with this investment. He felt that he would have money for his children and for their college educations. The defendant told him that "I should have no problem making two million off a percentage point." (Tr. at 32).

Pues decided to invest $100,000 in Koala Productions. That week he received "two percentage points." He was told he would receive the $100,000 back "before the movie is shot." In order to obtain this money, he sold certain precious metals of the Mammoth Bullion firm. Pues never had any direct agreement with Koala Productions. However, he did sign the last page of an agreement with Lev Parnas. Specifically, on November 14, 2010, he signed and received the last page of the agreement so that he would be able to buy into Koala Productions, the movie business. (Pltf's Ex. 3). Lev told him that he didn't have any other pages of the agreement. Although the agreement states that the purchase price was one million dollars, his initial investment was $100,000. This was the only money he had. Lev knew that he was in the process of obtaining a divorce and had no other income. All the money he had was the $100,000 in Mammoth Bullion and he also owned a boat.

At this time, Lev Parnas was his broker and he knew how much money Pues had in the Mammoth Bullion account. Pues signed the agreement, (Pltf's Ex. 3), knowing that his investment was $100,000. Pues never saw any other page in the agreement, whose last page he signed, until a month later when he met with Rudy Durand in New

4

York. The agreement is entitled "Subscription Booklet for Parnas Holdings Inc." (Pltf's Ex. 3). This was the only document that Pues signed.

As stated above, Pues received $100,000 from Mammoth Bullion, which he used to invest in the movie "Anatomy of an Assassin," to be made by Koala Productions. Also, as stated above, Pues was to receive "two percentage points of gross from the Koala Productions the movie." (Tr. at 47). Pues was supposed to receive the return of his $100,000 when the movie got budgeted, in about two years.

In January 2011, Pues was told by Lev that Durand needed another $400,000 from Parnas or Pues would lose his investment of $100,000. They needed a total commitment of $500,000 to make the movie deal. This disturbed Pues because the $100,000 was his "life savings." Pues started scrambling in an effort to raise the $400,000 so that he wouldn't lose his $100,000. At that time, David Correia was the President of Parnas Holdings. Also, Lev brought up his family trust and the "bridge loan." Pues told Lev, "I can do a bridge loan but it's a bridge loan, its my parents' savings that's all they have." (Tr. at 53). Lev asked for the $350,000 and he would cover the rest. Pues said if loaned, the money had to be repaid in forty-five days. "It's their savings, that's all they have." (Tr. at 53).

Lev asked Pues to speak to his parents to find out if they could do a short-term bridge loan. Pues told Lev that he was the executor of a family trust for the benefit of his parents who lived in Jupiter, Florida. He told Lev that he would talk to his parents and ask them if they wanted to do a short-term bridge loan that would have to be paid back. "That's all they have." (Tr. at 54).

5

So that in January 2011, Pues had a conversation with his parents and asked
them to make the loan with the trust funds. After that conversation with his parents,
Pues discussed the matter with Lev, as follows:

Q.   After you had a conversation with your parents regarding the use of
     the trust funds for this movie deal, did you have a conversation with
     Mr. Parnas regarding the use of those funds?

A.   Yes.

Q.   Did he understand where the $350,000 was coming from?

A.   Yes, he knew.

Q.   Did you explain to him where the $350,000 was coming from?

A.   Yes, I told him.

Q.   What exactly did you tell Mr. Parnas?

A.   I told him my parents' family trust, it's their retirement money, and they
     said they can do the bridge loan short-term - - they wanted it back within
     45 days.

     And they wanted know why they should do it and that's when
     Parnas says he would throw in a bonus of 2 percentage points from the
     gross of the movie if they give him $350,000 towards the movie deal, so it
     saved them about $100,000, and it saved them a part - - temporarily until
     the money would be raised by Lev or whoever, for the movie.

     And he'd pay it back within 45 days which was March 15th, I
     believe, it was supposed to be paid back.

Q.   So your understanding was that you were going to give Mr. Parnas
     $350,000 out of your family's trust account and it would be paid back
     around March of 2011?

A.   Yes.

Q.   When did you have this conversation with Mr. Parnas?

A.   That was in January.

6

Q.      Do you recall if it was a phone conversation or was it in person?

A.      It was in person, I believe.

        THE COURT:      January of what year?

        THE WITNESS:    2011.

BY MS. MOVAHED:

Q.      Was it in New York or in Florida?

A.      There was one meeting in New York and then it was down in Florida.

Q.      Did you sign any documents regarding this loan of $350,000 to Mr. Parnas?

A.      No.

                        *    *    *    *    *    *

Q.      Did you have an oral understanding with Mr. Parnas regarding the return of $350,000?

A.      Yes.

        It was an oral agreement for a return, it was 45 days.

Q.      And Mr. Parnas - - and you expressed to Mr. Parnas that this $350,000 was coming out of your family's trust account.

        Is that correct?

A.      Yes.

        He knew exactly where it was coming from.

(Tr. at 58-60).

So that Pues explained to Lev the reason the money had to be repaid in forty-five days. The 2009 Pues Family Trust Agreement was received in evidence as Plaintiff's Exhibit 10. At the end of January 2011, $350,000 was transferred from his family's trust

account into Parnas Holdings to be sent to Koala Productions to make the movie and, as Pues testified, "to save my $100,000 investment." (Tr. at 69). Pues also stated that he needed the $350,000 back into the Trust account to make certain payments to the IRA to avoid paying taxes and penalties.

Pues testified that the bridge loan of $350,000 was to be repaid in March of 2011. He did not receive the payment by that date and he started sending e-mails to Parnas. His father passed away on March 17th and they wanted to make sure the money was returned. However, Lev Parnas never responded to his e-mails or accepted his telephone calls. This Trust Fund was to take care of his mother financially and they needed the money for that purpose. Other than social security and the father's small pension, his mother relied on the money in the Trust Fund. In fact, Pues had to pay for his father's burial and cremation with his own money.

On April 21, 2011, Pues sent a certified letter to Lev Parnas (Pl. Ex. 12). The letter clearly refers to "the outstanding balance on the unpaid $350,000 loan, made to Parnas Holdings Inc. from the Pues Family Trust IRA." The letter stated the following:

### Final notification

Lev

I wanted to address with you again, as previously stated in my e-mail dated March 27, 2011, as well as in our recent conversation in your office this past Monday, the outstanding balance on the unpaid $350,000 loan, made to Parnas Holdings Inc. From the Pues Family Trust IRA. The loan was made at the request of yourself as a bridge loan to Parnas Holdings Inc. to be exclusively utilized as investment capital to save the deal with Koala Productions for the movie "Anatomy of an Assassin." As you are aware the loan was governed by very specific terms and was to be repaid by March 12, 2011. These terms were not met, and as a result

taxes and penalties totaling $161,000.00 were assessed by
the IRS bringing the total outstanding amount due to the
Pues Family Trust from Parnas Holdings Inc. to
$511,000.00.

(Pltf's Ex. 12).

There is a signature on the certified letter indicating the letter was received on

delivery. Also, there is an undated e-mail in evidence from Pues to Lev (Pltf's Ex. 1)

which indicates that the $350,000 is to be paid back within forty-five days from January

26, 2011. The Court notes that this document from the plaintiff does not use the words

"bridge loan."

There is also another e-mail in evidence (Pltf's Ex. 1, page no. 00003). This

e-mail is also from Pues to Lev and is dated March 28, 2011, and includes the following

language:

Hi Lev‹ Hopes this finds you well. I was hoping you could
send me verification of the receipt of the 10% we are
expecting from the movie deal with Rudy. As you know, I
personally wired Rudy $100,000 in addition to the $350,000
bridge loan money sent to Parnas Holdings from the Pues
Family Trust IRA, also intended for the movie deal. As
previously discussed, the terms of the bridge loan were that
the $350,000 was to be paid back net 45 from the date of
1/26/2011. . ..

In the meantime, please forward copies of the contracts that
we discussed in your office last week regarding raising the
additional funds for the movie, so that I can get the
$350,000, plus paid back to the Family Trust. Thanks in
advance.

Mike.

Another important document in evidence as part of plaintiff's exhibit 1, page

00005, dated May 25, 2011 is an e-mail from David Correia of Parnas Holdings to Pues.

In part it reads as follows:

Michael,

as per our conversation a few moments ago, I am sending
you this email while we are waiting for the documents to be
put together by our attorney. In the meantime, Lev wanted
you to have something in writing for your security.
Parnas Holdings, Inc agrees to put up as collateral, 2pts of
our ownership of the film "Memory of a Killer" for the $510k
owed to the Pues family Trust. As you know, this is the
amount agreed upon between you and Lev yesterday. I will,
however, mention to him that you are requesting a change in
these terms. I or Lev will get back to you with a response to
that request at some point tomorrow. Please note that this
will entail holding off the lawyer from executing this
agreement until both sides agree upon the said terms.

\*   \*   \*   \*   \*

Take Care,

David Correia
561-445-6612

This "change in the terms" referred to in the e-mail was a request for more

"points". Also, in this exhibit the words "bridge loan" are not mentioned.

On March 22, 2011, Pues called Correia to find out about the repayment of the

money owed to the Pues Family Trust. He called a number of times to Correia and Lev

about repayment of the loan. He called on his mother's birthday to try to get her repaid.

His father had passed away a month before. The $350,000 alleged bridge loan

comprised most of the money in the Pues Trust Fund.

The only person at Parnas Holdings that he was able to communicate with was

Mr. Correia. After he transferred the money into Parnas Holdings he could not

communicate with Lev Parnas. He was unable to have any further communications with

Lev Parnas. Correia told him that they didn't have the funds to make the payments, but

they were trying to obtain the funds to do so. At that time, in April 2011, his parents' taxes were due. As the executor of his parents Trust account, Pues took care of all the financial affairs including the payment of any taxes. The current tax return showed that $103,831 was due in 2011 with interest accruing for the last four or five years.

On June 2, 2011, Pues sent an e-mail to Lev Parnas. He stated that this was the final notification of a termination of any direct correspondence between Pues and any principal of Parnas Holdings Inc. and in the future he is to correspond with the attorney for Pues. Lev kept saying that he was going to take care of it and gave excuse after excuse and "nothing happened." (Tr. at 114).

On cross-examination, Pues testified that he was in the construction field as a marble setter. His company was called Veterans Stone, Inc. In 2013 to 2014, he did "maybe $300,000 or $400,000 per year." He and his wife are finalizing a divorce. They owned a house in Long Beach, New York. Lev Parnas was his personal broker through the Mammoth Bullion company. He paid the brokerage fees to Mammoth.Pues signed the "agreement" on the last page without having seen the balance of the agreement. Lev told him it was "just a formality, don't worry about it." He signed the last page of the agreement to invest in the movie. The agreement said that it's for a million dollars and Pues objected to that. Lev told him not to worry, it's just a formality. He trusted Lev Parnas. He was told to sign the last page and he did so without reviewing the entire agreement. On December 8, 2010 and on December 17, 2010, Pues wired a total of $100,000 to Koala Productions and not Parnas Holdings. He was investing in a movie. He was to receive two percent of the gross proceeds of the movie called "The Memory of a Killer." In somewhat confusing testimony, Pues testified that he had an agreement

11

with Parnas Holdings who had an agreement with Koala Productions. Pues had no direct agreement with Koala Productions. So that Pues testified that he believed that he gave $100,000 to Parnas Holdings – in return for a two percent interest or two points in Koala Productions; namely $50,000 per point. Pues testified that the $100,000 was an investment in Koala Productions, as follows:

> Q. Just continuing, and those two points you bought without an agreement through Koala Productions, was that an investment or was that a loan?
>
> A. That was an investment in it because they told me I would get it back before the movie – when it was budgeted, it would get paid.

(Tr. at 169).

Pues received no documentation to establish he had the two points from Koala Productions:

> Q. You sent $100,000 to a guy and you assumed you had two points in the movie.
>
>    That's in essence your understanding of your agreement with Koala Productions and you're entitled to those two points?
>
> A. Yes.
>
> Q. But at the time, when you send those monies in December 2010, you understood that each point in Koala Productions or rather in the movie project was worth 50,000 apiece?
>
> A. One point, 50,000 percentage point, yes.
>
> Q. To your knowledge, at any time thereafter did the value of those points change?
>
> A. No.

(Tr. at 170).

12

Pues testified that Lev gave him two points as a bonus for providing the bridge loan for $350,000. Lev told him that he needed a bridge loan or the Trust would lose the $100,000 previously paid. Pues was then questioned extensively about the Pues Family Trust. Pues commenced this action as the executor of the Pues Family Trust. His mother and father both wanted him to handle their finances and pay their taxes. The Pues Family Trust made the bridge loan to Parnas Holdings, which loan was guaranteed by Lev. The loan was made in January 2011. He discussed the bridge loan with his parents. The Pues Family Revocable Trust Agreement is in evidence as Pltf's Ex. 10. At page 139 of the exhibit, it says that William C. Pues and Mary Pues are the Trustees by various powers. However, at page 170 of the Trust Agreement, it states that in the event that William C. Pues is not living or is incapacitated, then their son, the plaintiff Michael Peter Pues shall be the guardian of the principal's estate and person.

Further, Pues testified that his father and mother not only gave him the written authority but both virtually told him that they wanted him to take care of all the finances and gave him the "power to move funds." (Tr. at 177). He decided to make the bridge loan with his parents' trust fund and his mother and father authorized the making of the loan. At the time, both parents were alive and they both approved the loan to Parnas Holdings. His parents didn't discuss the loan with Lev Parnas; he was the one who did so. In lieu of interest on the loan, there was an agreement of two points in the movie project and to save his $100,000 previously invested. The points were worth $50,000 each. The loan was made to both Parnas Holdings and Lev Parnas.

13

On April 27, 2011, Pues sent an e-mail to Lev Parnas in which he stated that you Lev "have personally guaranteed repayment of the now overdue loan." (Dfts' Ex. E). Pues stated that Lev **Parnas** personally guaranteed the bridge loan to Parnas Holdings in the sum of $350,000. Although the e-mail itself is undated, the receipt is apparently dated April 21st. The e-mail further stated that the terms of the loan, namely repayment by March 12, 2011, "were not met and as a result, taxes and penalties totalling $161,000.00 were assessed by the IRS bringing the total outstanding amount due to the Pues Family Trust from Parnas Holdings Inc. to $511,000.00." (Dfts' Ex. E).

Pues testified that this was one single bridge loan to Parnas Holdings Inc., in the sum of $350,000, which was personally guaranteed by Lev Parnas. This oral agreement was made in Lev's office. Actually, the alleged assessment by the IRS of the sum of $161,000 was just a "rough estimate" by Pues. (Tr. at 193).

Q.    How did the IRS assess those penalties?

A.    They did. It was just an estimate. That's all we could have is an estimate with the IRS. We didn't know what the penalties were so we took a ten percent guess at it and the taxes, figured out what the tax bracket which was. The taxes were $104,000. I seen the tax of 2011, 2010, said $103,000 and change and the other $50,000 was just a rough estimate. I'm not the IRS. They assess what they want, how they want it.

Q.    Is this accurate. Did the IRS assess $161,000 to the family trust in April of 2011?

A.    No, I'm not - - no. I have no idea. I was trying to get paid back the money to my family trust and the IRS had hit penalties. I guessed that.

Q.    It was an assumption?

A.    I assumed.

14

(Tr. at 193).

* * * * *

THE COURT: Listen to me. You estimated this but there was never actually levied this $161,000?

THE WITNESS: The IRS, no. Never sent any paperwork on that. I wrote it out as I thought you would pay the IRS that amount which you do, don't you?

(Tr. at 195-196).

The defendant raised the question of whether the Trust authorized the making of a loan such as the one on which this action is based. In a review of the Pues Family Revocable Trust agreement (Pltf's Ex. 10), the defendant asserts that it is "unclear if there is any authority whatsoever here with respect to loans to third parties." (Tr. at 203). In response, plaintiff's counsel points to paragraph O of Pltf's Ex. 10, which provides as follows:

> "O. To perform all other acts necessary for the proper management, investment, and distribution of the Trust property."

Asked to explain how he, as an "Executor" of the Estate is acting as a "Trustee" of the Trust, Pues turned to Dfts' Ex. 10 at page 170, which reads as follows:

> In the event the Principal's spouse, WILLIAM C. PUES is not then living, or upon his death, resignation, or if at any time he is incapacitated, the Principal's son, MICHAEL PETER PUES, shall be appointed as the guardian of Principal's estate and Principal's person. In the event the Principal's son, MICHAEL PETER PUES is not then living, or upon his death, resignation, or if at any time he is incapacitated, the Principal's son, WILLIAM DENIS PUES, shall be appointed as the Second Alternate guardian of Principal's estate and Principal's person.

15

(Tr. at 170).

This statement was signed under oath by Mary E. Pues on April 28, 2009. Pues testified that he acted on behalf of the Trust both under the power of attorney and as a trustee. His parents told him to take care of the Trust. The Trust gives him the power "to take care of his parents to the best of my knowledge and to the best of my ability." (Tr. at 212). When he made the bridge loan he was acting both as a trustee and under the power of attorney.

During this period, Pues had been injured, was not working and had surgery to his shoulder. Under doctor's instructions, he played golf to exercise his shoulder.

Pues again stated that he had wired $100,000 from TD Bank to Koala Productions and Rudy Durand for the movie. Then about a month later he sent $350,000 to Parnas Holdings as a bridge loan from the family trust.

In December 2010, and January 2011, Lev told him that he wanted to buy his boat for $100,000. His wife owned one-half of the boat and had to receive half of the funds. He signed the bill of sale for the boat but his wife did not sign. In addition, Pues felt that it was not a valid bill of sale agreement. He stated that the boat was sold without his knowledge. He hasn't sued to recover the value of the boat because of this pending law suit. Strangely, Pues testified that he reached an agreement with Lev to sell the boat to him for $100,000; he shipped the boat to Florida where Lev sold the boat without his consent and retained the money received from the sale of the boat. Yet, he did not pursue any remedy against Lev in a court of law. The bill of sale of the boat (Dfts' Ex. D, p. 65) indicates that the date of the sale was January 24, 2011. The name

16

of the purchaser appears twice on the bill of sale. In the main section, the space for the name of the purchaser states Parnas Holdings Inc. On the bottom of the bill of sale under the word "certification", the space entitled "Purchaser's Printed Name" has the name Lev Parnas.

The assets of his parents' trust consist of a condominium, the money in the trust account in the amount of approximately $15,000, and a checking account in the sum of approximately $1,000. He had explained to his parents that he was withdrawing the $350,000 to make the bridge loan in return for the two percentage points in the movie. He told them he trusted Lev very much "and we did it". (Tr. at 243). Again, he testified that Lev told him that we didn't need paperwork. "It was a short term. It was all trust issues. He was my adviser . . . a fiduciary duty whatever you call it." (Tr. at 243).

Pues had been going through a divorce for the last five years. His wife owned one-half of his assets. He had formed a company with his brothers called Med Investment. Also, his wife owned one-half of the boat he sent down to Florida at a cost of $10,000.

On redirect examination, Pues testified that the trust was created to take care of his parents and their assets. He discussed the bridge loan of $350,000 with his parents. He again reviewed his discussion with Lev; the bonus two percentage points to be paid; and the repayment within forty-five days. He stated that there would be an IRA penalty if the money was not paid within sixty days.

On April 27, 2011, Pues sent an e-mail to Lev Parnas (Pltf's Ex. 9, p. 119) in which he stated that Lev personally guaranteed repayment of the overdue loan. Again,

17

he testified that he trusted Lev Parnas. Lev wanted to purchase his boat for $100,000 and that's why he shipped the boat down to Florida. As stated, half of the purchase price of the boat would go to his wife. The boat was ultimately sold and neither he nor his wife received any proceeds from the sale of the boat.

Pues testified repeatedly that he trusted Lev Parnas and he believed what Lev was telling him. Lev was his personal and financial adviser. His investment decisions were based on the guidance and advice he received from Lev Parnas. Lev always told him that his investments were "rock solid, guaranteed to make money." (Tr. at 262-263). Lev guaranteed that he would receive the $350,000 back within forty-five days or even a shorter time. Lev told him that a written agreement was not needed because he will get the money back, "it's guaranteed." (Tr. at 264). Pues didn't know that Lev Parnas was involved in twenty other entities. On cross-examination, it was brought out that he only knew Lev Parnas since October or November 2010, only a few months prior to these transactions.

George A. Hanner is a real estate broker and appraiser. In 2007 or 2008, he met Lev Parnas who said he was Vice President of the Monolith brokerage firm which dealt in commodities.

Hanner had dealt and had an account with the Monolith firm and was unhappy with its operation. Parnas told him that he was going to make his life better. Lev wanted to manage his account. He had at least $100,000 in the Monolith account. Lev told him that, "He was going to use his expertise to make sure I had the right trader." (Tr. at 122). Based on Lev's "expertise" Hanner invested about $500,000 with Monolith over a period of a few years.

Eventually, Lev Parnas left the Monolith firm and was involved in a company called Parnas Industries or Associates Company. Half of Hanner's $500,000 investment in Monolith was gone. Lev's explanation was "that's the way the market works." (Tr. at 124). Hanner also invested in Parnas Holdings Co. He believes that Lev was the president and chairman. Lev told him that Parnas Holdings intended to raise $20 million dollars and use the funds to invest in investment opportunities. Hanner estimates that he lost about $450,000 of the $500,000 he invested in the Monolith firm.

Hanner sought to recover his lost money. He thought there were some transactions that were fraudulent. Lev Parnas told him that he was involved in other new ventures. Hanner lost about $470,000 in his investment in Monolith over a period of about three years. During that time, he received no dividends, interest or money of any kind on his investments. Nor did he receive any documentation. During this time, Lev told him that "all the investments were doing fine." (Tr. at 129). Eventually, he was told that part of his investment was involved in a movie called "The Assassin." He thought $100,000 of his investment was involved in the movie. However, he has no proof that he has any interest in that movie.

His last communication with Lev Parnas about getting paid on his investment was about six months prior to his testimony. At that time, Lev told him that he was going to work things out and pay him back the money. Hanner told him that he was going to hold off any legal action until about the end of the year. Lev told him that he would present him with a plan to pay back the money by the end of 2015. Hanner received no such plan.

Hanner spoke to Rudy Durand only one time.

On cross-examination, Hanner testified that he signed a written agreement with Lev Parnas in which he agreed to hold off any legal action. He referred to the money that he gave to Parnas as an investment and not a loan.

Rudy Durand testified at length about his service in the military in the Korean War and his other activities in his life. He first met Lev Parnas in 2000 in Beverly Hills, California. He liked him. After that they kept in touch when Lev was visiting back and forth to California. They became good friends. There came a time when they discussed the possibility of Lev investing in a film that he was in the process of purchasing. Lev told Durand that he had money to invest.

Durand first met Michael Pues in December 2010 at the Carlisle Hotel in New York City. Lev told him that Pues was one of his investors. He explained the difficult film business to Pues. He was looking for investors for a film, "Memory of a Killer." Lev told him that Pues would be one of the investors. The initial investment deal would be $500,000 for ten points of the producer's share. Initially, only $100,000 was paid and the balance of $400,000 would be paid on or before January 11, 2011. Pues paid the initial payment of $100,000 in two wired payments of $50,000 each to his company, Koala Productions.

Durand told Lev and Pues that if he didn't get the additional $400,000 by January 15th, they would lose the $100,000. Parnas did come up with the additional $400,000. He believed that the money came from Lev. Further, he stated that the money came from David Correia on behalf of Parnas Holdings. A formal agreement was signed at his attorney's office with regard to the $500,000 investment and Pues attended that meeting.

Of importance, Durand testified that Pues and Lev Parnas had a discussion,
"about something to do with supposedly Mr. Pues had loaned Mr. Parnas $350,000
which would be the money.  That would be part of the executed formal agreement . . .."
(Tr. at 293).  This discussion took place in front of Durand at an Italian restaurant and
then later at the Beverly Hilton Hotel.  The exact testimony is as follows:

Q.    And then what happened?

A.    Then we went to have lunch and Mr. Pues asked me if I had received the
      $400,000 and I said I don't think I received the $400,000.  And then Mr.
      Pues and Mr. Parnas had a discussion about something to do with
      supposedly Mr. Pues had loaned Mr. Parnas $350,000 which would be the
      money that would be part of the executed formal agreement and it was a
      heated discussion.

Q.    Was this discussion in front of you?

A.    Yes.

                    *    *    *    *    *

Q.    Well, before you left them alone, what did Michael say and what did he
      say - - what did Michael say and what did Mr. Parnas say?

A.    Basically what I got from this, I don't know what was going on, I was busy
      getting my movie ready, is that Michael Pues had loaned $350,000 prior to
      Lev and him coming to California to execute the agreement; that Mr. Pues
      had gone to Florida and loaned $350,000 in order to save his $100,000
      which Mr. Parnas was to send it immediately to my company.

      Therefore, the 350 that was being paid from the loan and the 100
      that Mr. Pues put up, there was still $50,000 lacking, and I believe Mr.
      Pues or either Lev said they would make up the $50,000 later.

(Tr. at 293, 294).

Even though their agreement specified that no one is allowed to sell anything
without written permission of his company, Durand found out that Parnas had sold a half
of a point to a third party for $250,000.  He was very upset and sent an e-mail to Lev

who did not respond. Durand has not spoken to Lev since that time. Further in his testimony, Durand again discussed the alleged $350,000 loan.

> Q.　Did there ever come a time that you had conversations - - let's start with Mr. Parnas first - - with Lev Parnas concerning an alleged loan from the Pues family trust to Parnas Holdings?
>
> A.　Yes. I testified to that earlier.
>
> Q.　Were there any more any conversations afterwards dealing with that subject matter?
>
> A.　Yes.
>
> Q.　When?
>
> A.　There were numerous. And there came a time, at the time I knew there was a confusion who owned what so I offered to be a mediator and try to mediate the problem between Lev and Mr. Pues. And that's during that particular period we had many discussions.
>
> Q.　Well, then, did Mr. Parnas ever admit to you that it was a loan?
>
> A.　Yes.
>
> Q.　And when was that?
>
> A.　The initial meeting at the lunch he didn't deny it. But his position was that the reason it was a loan - -
>
> Q.　I'm not asking you for his position. Just what did he say? Did he admit to you that it was a loan? Yes or no?
>
> A.　Yes.

(Tr. at 306, 307).

Durand testified that Pues currently owns an interest in the film, in the sum of $100,000 or two points. However, Pues subsequently owned a total of four points in the

film, including two points from him and two points for the family trust. Again, Durand

referred to the subsequent payment of $350,000, as a loan.

> Q. I don't mean to characterize this in any way. I'm not suggesting there is
> an admission. But in your mind, you are not really delineating between
> the trust or Mr. Pues. It is four points somewhere between Mr. Pues and
> the trust, and that is what is owned in that world of investors.
>
> A. My previous conversations prior to sending this email, Mr. Parnas
> informed me that he was giving two points to Mr. Pues for his family as a
> bonus for the loan that his family gave him. Subsequently we have it right
> in this email.
>
> Q. So there's four points.
>
> A. Four points - yes.

(Tr. at 334, 335).

Durand testified that at one time the value of each point was $50,000. However,

today the value is probably much higher. Durand was introduced to Pues by Lev

Parnas at the Carlisle Hotel as one of Lev Parnas' investors. The responsibility of either

Lev Parnas or Parnas Holding in the movie was the sum of $500,000 for ten points.

Since Pues didn't have a company, Lev suggested using Parnas Holdings, his

company's name.

On redirect examination, Durand testified that Lev Parnas was not trustworthy

and he was in breach of their contract. He also stated that Lev Parnas was trying to

promote his film and keep the money for himself instead of the money going to Koala

Productions. So that at one time he liked and trusted Lev, but that he later found him to

be a con artist.

On recross, Durand again referred to "this loan" on several occasions and that

Mr. Parnas did borrow the money of $350,000. (Tr. at 361, 362, 363, 364) (???361-

364). One such statement is as follows:

> Q. And just finally to follow up on that, sir, while you were not part of any
> negotiations nor privy to the original agreement between Mr. Parnas and
> Mr. Pues, is it not a fact that you testified that Mr. Parnas, himself,
> admitted to you that the money from the Pues Family Trust was a loan?

> A. Yes, he had.

(Tr. at 365).

At the conclusion of Durand's testimony, the plaintiff rested with the exception of

the testimony of Mary Pues, the mother of Michael Pues, who resides in Florida.

At the conclusion of the plaintiff's case, the following motions were made with the

decisions of the Court.

(1)     The plaintiff moved to conform the pleadings to the evidence with regard

to the boat owned by Michael Pues. In this regard, the plaintiff asked to amend the

pleadings to add a cause of action to recover $100,000, the value of the boat which Lev

Parnas allegedly took possession of and the additional sum of $10,000 in expenses

paid by Michael Pues. This motion by the plaintiff was denied as "being much too late"

and "prejudicial".

(2)     The defendants' moved to sever the first cause of action for breach of

contract into two separate claims. One cause of action was on the alleged loan to

Parnas Holdings Inc. The second cause of action would be a guarantee of that loss by

Lev Parnas. That motion was denied.

24

(3)     As to the defendants' motion to dismiss the second cause of action sounding in "Fraudulent Inducement of Contract," the Court reserved decision.

(4)     As to the third cause of action in conversion, decision was reserved on the defendants' motion to dismiss.

(5)     As to the fourth cause of action sounding in fraud, the Court reserved decision on the defendants' motion to dismiss.

(6)     As to the fifth cause of action sounding in prima facie tort, the Court granted the plaintiff's motion and dismissed this cause of action.

(7)     As to the sixth and final cause of action sounding in Unjust Enrichment, the defendants' declined to move to dismiss and reserved the right to move on papers.

Therefore, at the conclusion of the plaintiff's case, there were still pending five causes of action; namely, breach of contract involving the alleged loan of $350,000; fraudulent inducement of contract; conversion; fraud; and unjust enrichment. In addition, the defendants' moved to add two affirmative defenses, namely, first, a parole evidence rule and a statute of frauds defense; and, second, a usury defense. As to both, the Court reserved decision.

The following morning, April 29, 2015, the defendants made an additional motion to dismiss the complaint based on the plaintiff's failure to establish his capacity to make the alleged loan, namely "for the failure to elect his capacity in which the actions were purportedly undertaken." (Tr. at 420). This motion was denied.

## B. The Defendants' Case

The defendant Lev Parnas testified as to his background. He came to this country when he was three years old. He attended Baruch University and Brooklyn College, but he did not graduate. He started working in real estate at an early age of sixteen and started his own company at the age of eighteen. He became a licensed Wall Street stock broker. In 1995, he moved to Florida and started his own company. Parnas acquired a Series 24 license which allowed him to acquire his own firm and oversee other brokers. He oversaw many other traders and brokers. His company "basically" closed in 2002. So that he was a licensed broker and a supervisor.

Parnas stated that he was a financial broker and financial adviser to thousands of individuals and companies. He took many companies public. He personally never had a complaint made against him. Parnas is currently not licensed. His believes that his license lapsed in 2004. He had no complaints against him as a financial adviser. Parnas advised thousands of people in an investment capacity, and only had one complaint; by Michael Pues.

Parnas testified that he was never the financial adviser to Pues. He was never employed by the Monolith Bullion Company but "helped consulting in this." (Tr. at 434). He met Pues and gave him financial advice in order to assist him. Pues was happy with the advice Lev gave him. Lev explained that Parnas Holdings Inc. is a company that he set up "to primarily invest in other ventures where I would allow other partners and investors to be able to participate with me on the ventures." (Tr. at 436).

The plaintiff Michael Pues entered into a Parnas Holdings Inc. Subscription

Agreement. (Dfts' Ex. A). Pues signed the Subscription Agreement on November 11,

2010 in the presence of Parnas. By his own handwriting, Pues added the purchase

amount as one million dollars. Contrary to the testimony by Pues, the entire agreement

had been presented to Pues and he not only signed it but he entered the purchase

amount as one million dollars. Further, Parnas testified that Pues entered his erroneous

social security number.

At that time, in 2010, Parnas Holdings was looking at various projects including

hotels, banks and a movie. He and Rudy Durand worked out an arrangement to fund a

movie called "Memory of a Killer." While there may have been some differences as to

similar agreements entered into evidence, Parnas testified that they were the same. On

one of the agreements in evidence, there is a handwritten statement which says, "Mike

to my old friend," signed with an initial which cannot be made out. Parnas stated that

this handwritten notation was written by Rudy Durand.

Parnas discussed the Subscription Agreement with Pues almost on a daily basis.

As stated above, the agreement called for Pues to invest one million dollars with Parnas

Holdings Inc. Pues only paid a portion of the million dollars he agreed to invest. Pues

paid $100,000 to Ludy Killers Promotions on behalf of Parnas Holdings Inc. and another

approximately $13,000 on the sale of the boat. Also, there was a fiscal payment made

by Pues in the sum of $350,000, which he described as an investment, as follows:

Q.    What portion did he pay?

A.  I don't have an exact accounting, but it was - - he paid $100,000 to Ludy Killer Productions on our behalf which is credited towards his subscription agreement.

Then there was a sale of a boat. There was another $13,000 or something. I don't have the exact figure credited towards his subscription agreement.

And then the final was the $350,000 that he invested which is why we're here right now talking about it which eventually would have been credited to his subscription agreement.

Q.  Do you have a subscription agreement with the Pues Family Trust?

A.  No, sir.

Q.  Do you have any agreements with the Pues Family Trust?

A.  No, sir.

Q.  Now, Mr. Pues, through his testimony, alleges that you worked out some kind of oral agreement for the loan.

Is that your customary business practice to do things through oral agreements?

A.  No, sir.

Q.  Is it your practice to do things in writing through binding contracts?

A.  Yes, sir.

Q.  Is that why, for example, when you entered into an agreement with Mr. Pues to fund you $1 million, we have a detailed subscription booklet evidencing the obligation?

A.  Yes, sir.

(Tr. at 450, 451).

So that Parnas testified that he had an agreement with Pues personally, and had no agreement with the Pues Family Trust. He also denied having any oral loan agreement with either Pues or the Pues Family Trust.

Lev Parnas testified that George Hammer was an investor in Parnas Holdings and was committed to two million dollars. Both Hammer and Pues signed the Subscription Agreement on the same day.

Parnas Holdings Inc. is currently defunct because of financial problems and because of financial commitments that Pues did not perform. He stated that Parnas Holdings Inc. relied on the one million dollar commitment of Michael Pues with regard to the movie deal and their investment and obligation in Ludy Killer Productions. Randy Durand was his mentor and they were trying to raise money to invest in the movie. When he signed the agreement with Michael Pues, it was confirmed that they would have one million dollars coming in to invest in the movie and Parnas Holdings assumed the obligation to fund a half million dollars to Ludy Killer Productions. At that time, there was no independent agreement between Pues and Ludy Killer Productions or Koala Productions or any affiliate of Rudy Durand.

Lev Parnas testified that Pues learned everything he knew in 2010 and 2011 about Koala Productions, the "Memory of a Killer" film. This investment opportunity in the movie was through Lev and Parnas Holdings Inc. He also introduced Pues to Rudy Durand. Also, the investor agreement with Ludy Killer Productions and Rudy Durand was executed by Ludy and Parnas Holdings, Inc.

A memorandum, dated December 5, 1010, was signed between Parnas Holdings and Rudy Durand for Impressionist Motion Pictures LLC and Koala Productions Ltd., with regard to the movie to be made. (Pltf's Ex. 14). Pursuant to the agreement with Parnas Holdings and Koala Productions, Pues made payments of $50,000 on December 8th and $50,000 on December 17th for a total of $100,000 paid in December 2010.

Thereafter, according to Parnas, they started having problems with Pues sending the money, and in turn problems with Koala Productions and Durand. Lev again restated that Pues had a binding agreement with Parnas Holdings to fund up to one million dollars; Parnas Holdings executed an agreement with Durand, Koala Productions and later through Ludy Killer Productions to fund money in connection with their investment in the film "Memory of a Killer;" $100,000 was received by Parnas Holdings; and there was an obligation by Pues to fund the balance of approximately a half million dollars.

Of importance, Lev Parnas stated emphatically that the $350,000 was not a loan. Among his numerous vigorous statements denying that the $350,000 was a loan is the following:

Q.    Mr. Pues then testified in order to save his purchase of two points per $100,000, another $350,000 had to be paid.

        Did you hear Mr. Pues testify to that?

A.    Yes, sir.

Q.    Can you explain to me what you think he means by that agreement?

A.      I don't know what he means by that agreement.

        But all I know is Mr. Pues obviously owed us money and I never borrowed money from him.

        Plus, remember, I'm a president of a corporation. So why would I personally borrow on behalf of all shareholders? That's not a logical business sense.

        Second of all, why would I borrow money from an individual that owes me money? It doesn't make sense.

(Tr. at 477).

Lev Parnas further testified that a few weeks after Pues sent the money he came to Lev "almost in tears and crying." He told Lev that he "made a big mistake," that he has to work it out to get the money back to his parents' trust account because he had a "big problem with one of his brothers." (Tr. at 480). He further asserted that the $350,000 paid was for Parnas Holdings and their other commitments in addition to the movie and the only obligation to the movie was in the sum of $250,000. Further, Lev denied that he told Pues that this was a "no risk sure thing deal and we will be flying on private jets." (Tr. at 481). On the contrary, Lev told Pues that it was a very speculative investment. It was a "high risk high reward" deal, as Durand told Pues.

Lev explained why an additional $350,000 was "owed or necessary" to save the plaintiff's $100,000. He testified that Pues stated they made an oral agreement "of some sort of a loan." (Tr. at 484). He stated that Pues owed more than $800,000 under the Subscription Agreement and the $350,000 was "toward his payment . . . what his investment was with Parnas Holdings Inc., (Tr. at 486).; as set forth in the Subscription Agreement.

31

Lev knew that the $350,000 came from the Pues parents' trust. Lev testified as to the only time the word loan was used, as follows:

Q.    Now Mr. Pues said it was a loan.

A.    Well, the only time the loan conversation came up like I said several weeks after the fact Mr. Pues called me up and he started panicking, with the brother - - I don't remember which brother - - that he needs to get the money back and he has ways to get the money back, but in the meantime he needs is documented that we need to do it as a loan because he was having problems with his either brother or parents. I don't remember exactly.

Q.    Did you ever agree to convert the investment into a loan?

A.    Never, sir. What I did - -

(Tr. at 487).

Lev testified that sometime after the $350,000 in investment funds were transferred to Parnas Holdings, Pues contacted him with a problem. He was having trouble with his family. Pues was very nervous and he asked Lev "to please help him out to turn it into a loan." (Tr. at 490). Lev responded that "it was impossible, and would not be prudent or proper." Hearing that Pues was upset, Lev tried to help Pues by giving him collateral of two points until it got resolved, "so his parents . . . would be more comfortable." (Tr. at 91). So that Pues tried to have Lev convert the equity contribution into a loan.

Pues told him that the Pues Family Trust was assessed taxes and penalties totaling $161,000 by the IRS. Lev stated that this statement was not true and the Pues Family Trust was never assessed $161,000 by the IRS. Based on the Pues statement, he agreed to a two point collateral transfer to help out Pues. However, Lev felt that he

was being defrauded. Lev reviewed a series of e-mails from Pues that he did not respond to. His partner David Correia responded that Parnas Holdings agreed to put up as collateral two points of its ownership of the film, "Memory of a Killer," "for the 510k owed to the Pues Family Trust." (Tr. at 498). He agreed to the total sum of $510,000 being owed to the Pues Family Trust because Michael Pues told him that there was a $161,000 tax bill levied on the Trust.

Lev Parnas testified that Pues tried to sell his boat to fund additional money into Parnas Holdings. Pues said he had an idea, that he would ship his boat down, sell it and credit some of the money toward his account and "50 percent of that money would be credited to his wife and 50 percent would be credited to his account . . .." (Tr. at 500). Pues told them that the boat was in good shape and worth $100,000. However, Lev testified that the boat "wasn't worth the money that it was towed to get there." (Tr. at 500, 501). So that Lev testified that Pues gave them the boat for them to sell and credit the proceeds to his account. The boat was transferred from Pues to Parnas Holdings for no consideration. As stated above, according to Lev, the intention was, "To sell the boat and get the funds and credit Mr. Pues' account," (Tr. at 507), meaning the Pues account with Parnas Holdings.

Lev testified that the boat was acquired by Parnas Holdings Inc. for no consideration and was resold. Most of the money was given to Koala Productions and Durand, approximately in the amount of $317,000. Parnas Holdings has zero points in the movie and has a dispute with Durand. So that Lev testified that he doesn't have the money and doesn't have the points; all he has is a law suit.

On cross-examination, Lev testified that he met Pues in connection with the Pues account at Monolith Bullion. Pues knew that the $350,000 was not a loan. He knew he was investing in the company. He had directed Mr. Correia to make sure, in writing, that the $350,000 was an investment and not a loan. In Plaintiff's Exhibit 1 (Pltf's Ex. 1), it is stated that Parnas Holdings Inc. agrees to put up as collateral two points of ownership of the film "Memory of a Killer," for the $510,000 owed to the Pues Family Trust. Lev saw this e-mail and the word "owed."

Lev set up Parnas Holdings Inc. to make investments in approximately the year 2000. Later in his testimony, he said it was in the year 2010 or 2011. He invested over $200,000 or $300,000. The shareholders of Parnas Holdings Inc., consisted of himself, Correia, Pues, Hammer and two smaller ones. The company is now defunct and it is bankrupt.

Lev first met Pues when he was introduced to him as a person who had an existing relationship with Parnas Holdings Inc., through someone in Monolith Bullion.

Lev had some disagreements with Randy Durand with regard to the film they were trying to finance. In one communication, Durand wrote that he was "shocked, dismayed and most of all very disappointed in your past transgression regarding my film." "I've tried to be your friend since the day we met by always sharing my respect of you." (Tr. at 557). Durand was telling Lev to cease and desist from advertising his film on Lev's web site. Lev had sold half a point in the film being produced by Durand for $250,000 and did not pay that sum to Durand and Koala Productions. As to Michael Pues, Lev testified that, "He was just supposed to fund his million dollar commitment to

34

Parnas Holdings." However, Lev did not know if he or Parnas Holdings ever made any written demands to Pues for the million dollars.

Pues got the $100,000 he invested in Parnas Holdings from his Monolith account. The additional $350,000 that Parnas Holdings received from Pues came from a trust, the Pues Family Trust; an elderly parents' trust. Asked whether that raised a "red flag" with him, Lev responded that he was happy that Michael was sending us the money because "we were owed the money and we were able to proceed with Mr. Durand at the time." (Tr. at 571).

At that time, in 2010, the only investments that Parnas Holdings had were from Pues and Hammer. Because of the financial problems with Pues, "we ended up going out of business." (Tr. at 572). Despite this situation, neither he nor Parnas Holdings ever filed a law suit against Pues to recover the million dollars, nor did they interpose a counterclaim in this law suit.

Lev Parnas knew that Michael Pues was a trustee for the Pues Family Revocable Trust. In the Parnas Holdings Subscription Booklet, (Pltf's Ex. 3), on the page signed by Lev Parnas, one of the participants is cited as "Michael Pues as Trustee of the Pues Family Revocable Trust."

As to the sale of the boat, Lev was told that the wife of Pues had a fifty percent interest in the boat. However, they did not remit that fifty percent of the value of the boat to Mrs. Pues. Instead, they credited that money to the investment of Pues. Lev stated that they had to invest $13,000 to make the boat usable and saleable.

In evidence is a document called the Participant Agreement (Pltf's Ex. 3, p. 37).

In this agreement, it states that the participant contributed the sum of $350,000 to the

company. However, significantly, Pues did not sign this agreement, as stated in the

following colloquy:

Q.   And he refused to sign this, correct?
A.   I don't know what happened with this. I wasn't involved with the situation.

Q.   It was never signed, right?

A.   Obviously if you don't have a signature, it wasn't signed.

Q.   That's because he told you, Lev, what is this? I never agreed to contribute
     $350,000; is that correct or not correct?

A.   Like I said, this was brought up after the fact, after he send (sic) the
     money.

        We went through a lot of negotiations to help him out. This was an
     attempt from our side to help him in his situation that he was going
     through.

        We asked our attorney to figure out a way where we can help him
     in his trust information situation.

(Tr. at 579, 580).

During Lev's testimony, he was questioned about a very significant document. It

was an e-mail from David Correia of Parnas Holdings to Michael Pues. (Pltf's Ex. 1, p.

000005). In this e-mail, dated May 25, 2011, Correia, representing Parnas Holdings

Inc. wrote to Michael Pues including the following language:

    Michael:

    as per our conversation a few moments ago, I am sending
    you this email while we are waiting for the documents to be

> put together by our attorney. In the meantime, Lev wanted you to have something in writing for your security.
>
> Parnas Holdings, Inc. agrees to put up as collateral 2pts of our ownership of the film "Memory of a Killer" for the $510k owed to the Pues Family Trust. As you know, this is the amount agreed upon between you and Lev yesterday.

(Pltf's Ex. 3, p. 000005).

Lev denied that the use of the word "owed" meant that the transaction was a loan. In their dealings with Durand, Parnas Holdings sent approximately $317,000 to him. According to the Subscription Agreement, Pues owes Parnas Holdings a million dollars. However, no demand for this sum of money was made by Parnas Holdings.

The defendants rested.

In rebuttal, the plaintiff's called Randy Durand. He testified that Koala Productions received a total of $300,000 from Parnas Holdings. Durand denied being a mentor for Lev Parnas.

On cross-examination, Durand testified that he asked to come here to court, "to testify regarding my knowledge about a loan that Mr. Pues made to Mr. Parnas." (Tr. at 610).

Both sides rested.

## II. THE FINDINGS OF FACT

After eliminating all of the extraneous and non-relevant facts, the Court is left with two viable factual questions to be decided as follows:

1. Did the plaintiff prove that the $350,000 delivered to Parnas Holdings Inc. was a loan – or was it an investment in Parnas Holdings Inc.?

2. Did the plaintiff prove any cause of action against the defendant Lev Parnas, individually?

The Court will now review the testimony and makes the following findings established by a preponderance of the credible evidence.

Michael Pues initially worked as a marble setter in the stone industry. In 1994, he started his own company called Veterans Stone, Inc. Unfortunately, Pues was badly injured in a construction accident in June 2008 and was out of work to 2011. In 2010, he met the defendant Lev Parnas. Lev was a stock broker who helped Pues with his investments and Pues trusted him. Lev opened an investment account for Pues.

In November 2010, Pues met with Lev at the Millennium Hotel in New York and they discussed various investments. At that time, the Court finds that Lev was his investment adviser and his broker. Pues trusted Lev and relied on him for investments. Lev spoke to Pues about a movie deal with Koala Productions. As a result of his accident – and a divorce, Pues had financial difficulties and was having trouble raising his three teenage children.

In December 2010, Lev was back in New York and spoke to Pues about investing in the movie. At that time, Pues met with Rudy Durand, who wanted Pues to invest in his company Koala Productions, which was involved in the making of the movie called "Anatomy of an Assassin." Pues had three children who were 16, 14 and 12 years of age as of 2010. At that time, Pues was having financial difficulties and Lev gave him the exclusive opportunity to invest in the movie deal that, according to Lev, would provide him with "a substantial amount of return." After having dinner with

Durand and actor Jack Nicholson, Pues was very impressed. Lev told him that he would make a lot of money with this investment. Pues felt that this investment would provide him with money for his three children and their future college education.

Pues decided to invest $100,000 in Koala Productions. He received "two percentage points" in the movie. Pues never had any direct agreement with Koala Productions. However, on November 11, 2010, he signed the last page of an agreement with Lev Parnas. (Pltf's Ex. 3). The agreement stated that the purchase amount was one million dollars. Lev told him that he did not have any other pages of the agreement and he did not see any other pages of the agreement until a month later when he met Rudy Durand in New York. The agreement is entitled "Subscription Booklet for Parnas Holdings, Inc." This was the only document that Pues signed.

In January of 2011, Pues was told by Lev that Durand needed another $400,000 from Parnas Holdings or Pues would lose his investment of $100,000. At that time, Pues discussed his family trust and a "bridge loan." The Court finds that the following conversation took place between Pues and Lev. Pues told Lev, "I can do a bridge loan but it's a bridge loan, it's a bridge loan, it's my parents savings; that's all they have." Lev asked him for the $350,000 and he would cover the rest. Pues told Lev that if he loaned the $350,000 in the parents' trust, that the money had to be repaid in forty-five days. He told Lev, "It's their savings, that's all they have."

The Court also finds that Lev asked Pues to speak to his parents to find out if they would do a short term bridge loan. In January 2011, Pues did obtain the approval of his parents to make this substantial short term bridge loan on the condition that it was

to be paid back within forty-five days, which date was March 15, 2011. The $350,000 was lent to Parnas Holdings for a bonus of two percentage points from the movie gross, and also, to save the prior investment by Pues of $100,000. No documents were signed in connection with the $350,000 loan; it was an oral agreement to return the money in forty-five days. Clearly, Lev knew that the money came from the Pues Family Trust account.

At the end of January 2011, $350,000 was transferred from his family's trust account to Parnas Holdings to be sent to Koala Productions to finance the movie. Also, Pues told Lev that he needed the $350,000 loan returned within forty-five days to avoid paying taxes and penalties. When he did not receive payment of the loan by the forty-five day period, Pues sent e-mails and made telephone calls to Parnas. Lev did not respond to the e-mails or the telephone calls. On April 21, 2011, Pues sent Lev a certified letter, which clearly referred to the "unpaid $350,000 loan." The certified letter was received on delivery. Also, these e-mails to Lev from Pues, which were not answered, are in evidence referring to the "$350,000 bridge loan."

After he transferred the $350,000 to Parnas Holdings, Pues was not able to communicate with Lev Parnas. The Court finds that the $350,000 was loaned to both Lev Parnas and Parnas Holdings Inc.

Q.     Who was the loan to?

A.     Lev Parnas, Parnas Holdings, was supposed to be used for the movie to save my $100,000 and everything.

*     *     *     *     *

40

THE COURT:     Excuse me.  Who was the loan to?

THE WITNESS:   Parnas Holdings and Lev Parnas.  Lev Parnas and
               Parnas Holdings.

(Tr. at 185).

As stated above, on April 27, 2011, Pues sent an e-mail to Lev Parnas in which

he stated that Lev "personally guaranteed repayment of the now overdue loan."  (Dfts'

Ex. E).

Q.     Mr. Pues, do you recognize this e-mail?

A.     I see it, yes, from myself, to Lev Parnas.

Q.     And it is your e-mail address, veteransstone@optonline.net?

A.     Yes, it is.

Q.     Now, here, on April 26, 2011, you write I want to make it clear to you - -
       strike that.

       I want to make it clear, that you, Lev Parnas, have personally
       guaranteed repayment of this now overdue loan.

       Is it your understanding that Mr. Parnas personally guaranteed
       the loan?

A.     Yes, he said he would.

                    *    *    *    *    *

Q.     Parnas, Limited, was the borrower and you have a separate agreement
       with Lev Parnas to act as the guarantor?

A.     No, Lev Parnas and he guaranteed it personally.

                    *    *    *    *    *

Q.     I'll read to you from this e-mail in which you testified earlier as to having
       sent.

There's an outstanding balance on the unpaid $350,000 loan, made to Parnas Holdings, Inc., from the Pues Family Trust IRA.

Later on in that e-mail you state: These terms were not met and as a result taxes and penalties totaling $161,000 were assessed by the IRS bringing the total outstanding amount due to the Pues Family Trust from Parnas Holdings, Inc. to $511,000.

So am I correct in saying that the loan was the Pues Family - - excuse me, the loan was to Parnas Holdings, Inc., and you alleged you had a separate agreement with Lev Parnas as the guarantor?

A. No, it was together. Lev Parnas is Parnas Holdings and he guaranteed, he said personally, I guarantee personally. That's it.

Q. Understood.

Now turning to paragraph 38 of your complaint - - excuse me. Strike that.

Turning to paragraph 48 of your complaint where you allege breach of contract. There you are not alleging one time then it appears, in fact there are two contract. There's one contract under the loan and another contract with Lev as guarantor.

Is that your understanding?

A. No, he personally guaranteed it.

Q. There was a loan and there was a personal guarantee?

A. No, Parnas Holdings, he said it is all one, I guess.

I don't know what you are looking for. I don't understand.

You're a law company, you cosign a loan, you guarantee it for your loan. Like my company has a line of credit and I personally guarantee it. It's one thing.

\* \* \* \* \*

Q. There was a guarantee and the loan is what you are alleging?

A.    I don't understand what you are saying.

Q.    I believe your testimony has been clear, so I'll move on.

A.    You are trying to separate it.

Q.    How was Lev Parnas, how would he personally guarantee the loan?

A.    I let Lev Parnas, my trust in him and who he is. I guess his fame and experience of being, you know, a stockbroker and running companies, intelligent, smart man. I trusted him with everything. He used to call me family.

Q.    Was it in person, was it through an e-mail, was it over the phone?

A.    No, in his office when he said it.

Q.    So you were in front of each other and you came to an oral agreement?

A.    Yeah.

(Tr. at 189-192).

The $350,000 loan to Lev Parnas and Parnas Holdings Inc. was corroborated by the testimony of Rudy Durand. As I stated previously, of importance, Durand testified about a conversation with Pues and Lev in which they stated that Pues loaned $350,000 to Lev to save his $100,000. He stated there were numerous conversations with Lev concerning "the loan from the Pues Family Trust to Parnas Holdings." (Tr. at 306, 307). He further testified that Lev Parnas admitted to him that it was a loan. (Tr. at 306, 307). In this regard, Durand testified that Lev Parnas himself admitted to him "that the money from the Pues Family Trust was a loan." (Tr. at 365).

43

The Court finds that there is one single bridge loan to Parnas Holdings, Inc. in the sum of $350,000, which was personally guaranteed by Lev Parnas in return for two percentage points in the movie and to safeguard the prior loan of $100,000 by Pues.

## III. DISCUSSION

### A. First Cause of Action - Breach of Contract

The plaintiff's first cause of action, delineated as a breach of contract, is in fact, an action to recover on a loan. The allegations in the first cause of action refer to the loan of $350,000. The defendants oppose this cause of action as against the defendant Lev Parnas. They contend that this complaint "has not asserted a cause of action against Lev as borrower but rather as guarantor."

As stated above, the Court finds that the loan of $350,000 was made to both defendants, Lev Parnas and Parnas Holdings Inc. and therefore, both defendants are liable for repayment of the loan. Under New York law, to establish a prima facie case of default on a loan, the plaintiff must provide proof of a valid loan and of the defendants' failure, despite proper demand, to make payment. A loan is a contract. To make out a viable claim for breach of a loan agreement, the plaintiff need only prove: (1) the existence of the loan; (2) breach of the loan contract by failure to repay the loan within the prescribed repayment date; and (3) damages as a result of failure to repay the loan. See, e.g., Fisher & Mandell LLP v. Citibank, NA, 632 F.3d 793, 799 (2d Cir. 2011); Eternity Global Master Fund Limited v. Morgan Trust Company of New York, 375 F.3d 168, 177 (2d Cir. 2004); Group Automotive, Inc. v. County Imported Car Corp., No. 07-CV-1454 RRM WDW, 2012 WL 11955634, at * 8 (E.D.N.Y. Aug. 5, 2012).

Here, the Court finds that the facts in this case are simple and uncomplicated. The plaintiff Pues Family Trust, acting by Michael Pues, made an oral loan of $350,000 to Parnas Holdings Inc. and Lev Parnas. The agreement was that the loan, taken from the Pues Family Trust Account was to be repaid within forty-five days. The loan was never paid and the plaintiff Pues Family Trust is entitled to judgment in the sum of $350,000.

The plaintiff asserts that in addition to the amount of the loan, namely $350,000, there is also due an additional $161,000. According to the plaintiff, this sum consisted of taxes and penalties assessed by the IRS against the Pues Family Trust because of the absence of the $350,000 loaned to the defendants. The Court declines to add this amount to the $350,000 loan. There is no viable evidence that the defendants agreed to pay the additional $161,000 and it is disallowed.

## B. Second Cause of Action - Fraudulent Inducement of Contract

The plaintiff contends that it has established all the elements necessary to prove its claim for fraudulent inducement of contract. This cause of action is based on the alleged "material false promise and misrepresentations to induce plaintiff to make a short term bridge loan to the defendants in its principal sum of $350,000." (Complaint ¶53).

Under New York law, the elements of a fraudulent inducement claim are: (1) the defendant makes a representation; (2) regarding a material existing fact; (3) which was false; (4) was known by the defendant to be false; (5) the representation was made for the purpose of inducing the plaintiff to rely upon it; (6) the plaintiff reasonably did so rely

45

on the representation in ignorance of its fallacy; and (7) did so, to his injury. See Computerized Radiological Services v. Sytex Corp., 786 F.2d 72, 76 (2d Cir. 1986); Topps Co., Inc. v. Cadbury Stani S.A.I.C., 380 F.Supp.2d 265 (S.D.N.Y. 2005).

In this case, the plaintiff failed to prove that the defendant Lev Parnas made a material misrepresentation, known to be false with the intention of inducing reliance by the plaintiff. The alleged "promise" set forth in the complaint — namely, the promise to repay the loan of $350,000 — was an integral element in the cause of action to recover on the loan and is thus duplicative of the plaintiffs' breach of contract claim. See Guilbert v. Gardner, 480 F.3d 140, 148 (2d Cir. 2007) ("The amended complaint, however, fails to support a claim of fraud under New York law because it is duplicative of the breach of contract claim.").

As to the other alleged representation set forth in the complaint, namely, that the prior loan by Pues of $100,000 would be lost if the additional loan was not made. The Court finds that this was not a false misrepresentation. Also, the plaintiff failed to prove that the $350,000 was not to be used for the movie project discussed. In addition, the alleged false representation to repay the $350,000 no later than March 12, 2011, was a component factor in the action on a loan and is not relevant in this fraudulent inducement cause of action. Also, the other alleged misrepresentations leading to the loan were either part and parcel of the loan cause of action itself or were not established.

Stated simply, the plaintiff failed to prove a material false representation made with the intention of inducing the loan of $350,000.

46

## C. **Third Cause of Action - Conversion**

In order to recover in this case, substantially based on an action on a loan, the plaintiff must prove the elements of a conversion action as distinguished from the acts involving the loan of $350.000. The plaintiff has failed to do so.

"Under New York Law, '[c]onversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession.'" Elsevier Inc. v. Memon, No. 13-CV-0257 (JS)(AKT), 2015 WL 1412745, at *12 (E.D.N.Y. Mar. 23, 2015)(quoting LoPresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997)). "To maintain a claim for conversion, a plaintiff must show: (1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." Moses v. Martin, 360 F.Supp.2d 533, 541 (S.D.N.Y. 2004) (internal quotation marks and citation omitted).

In any event, a claim for conversion "cannot be predicated on a mere breach of contract." Piven v. Wolf Haldenstein Adler Freeman & Herz L.L.P., No. 08CL 10578 (RJS), 2010 WL 1257326, at *9 (S.D.N.Y. Mar. 12, 2010)(citation omitted). "Rather, to state a claim for conversion, a plaintiff must allege 'independent facts sufficient to give rise to tort liability.'" Id. (citations omitted).

Here, the Court finds that the plaintiff's conversion claim is simply a restatement of the breach of contract action on a loan claim based on the defendants' failure to repay the loan. Thus, there is no basis for a claim that the defendants violated an

independent tort duty owed to the plaintiff. There was no proof of an unauthorized conversion of this $350,000. The plaintiff loaned the money to the defendants and there was no proof of unauthorized conversion in this case.

## D. **Fourth Cause of Action - Fraud**

To prevail on a fraud cause of action, a plaintiff must prove: (1) that the defendant made a misrepresentation; (2) as to a material fact; (3) which was false; (4) known to be false by the defendant; (5) made for the purpose of inducing the plaintiff to rely on it; (6) that the plaintiff rightfully did so rely; (7) with ignorance of its falsity; and (8) to his injury. Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994); Murray v. Xerox Corp., 811 F.2d 118, 121 (2d Cir. 1987).

Again, what the plaintiff presented was an action on a loan. There was a failure to prove fraud. As stated previously, and explained by the defendants, "a fraud claim may not be used to restate what is eventually a claim for breach of contract." Wall v. CSX Transp. Inc., 471 F,3d 410, 416 (2d Cir. 2006). In the Court's view, the plaintiff failed to prove that Lev Parnas made a false misrepresentation as to a material fact for the purpose of inducing the plaintiff to rely on it. Accordingly, the fraud cause of action is dismissed.

## E. **The Sixth Cause of Action - Unjust Enrichment**

Under New York law, to make a claim for unjust enrichment, a plaintiff must prove that: "(1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Legurnic v. Ciccone, No. 09-CV-1436 (ADS), 2014 WL 6674593, at *7

(E.D.N.Y. Nov. 25, 2014) (Spatt, J) (citing Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004)); see also, Transcience Corp. v. Big Time Toys, LLC, No. 13-CV-6642 ER, 2014 WL 4827878, at *6 (S.D.N.Y. Sept. 23, 2014) (same). "The basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in 'equity and good conscience' should be paid to the [p]laintiff." Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 790, 967 N.E.2d 1177 (2012) (citing Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 172, 182 (2011)).

In the plaintiff's Proposed Findings of Fact and Conclusions of Law, in support of this cause of action, the plaintiff alleged that "Plaintiff has produced documentary evidence showing that $350,000 was loaned to defendants . . . Defendants have retained those funds for its own pecuniary gain and their failure to repay or return these funds to plaintiff has resulted in damages." In the Court's view, these allegations support the cause of action on the loan but fail to establish an unjust enrichment claim.

As stated above, repeatedly, an unjust enrichment claim cannot be asserted in what this proof reveals as a breach of contract on a loan cause of action. Not only is the claim for unjust enrichment merely duplicative of the loan cause of action, it has not been established. The plaintiff had agreed to accept two points in the film "Memory of a Killer," as compensation for the loan and he has received those two points.

In this regard, the New York Court of Appeals has held that an "unjust enrichment claim" "is not a catchall cause of action to be used when others fail," and has dismissed such claims where they are duplicative of other claims. Corsello, 18 N.Y.3d at 791, 967 N.E.2d 1177 ("To the extent that these claims succeed, the unjust

49

enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects. The unjust enrichment claim should be dismissed."); Town of Walkill v. Rosenstein, 40 A.D.3d 972, 974, 837 N.Y.S.2d 212 (2d Dept. 2007) ("For reasons other than those set forth by the Supreme Court, those branches of the defendants' motion which were for summary judgment dismissing the causes of action alleging breach of fiduciary duty, fraudulent concealment, unjust enrichment, and breach of contract were properly dismissed. They were merely duplicative of the legal malpractice cause of action, as they arose from the same facts and did not allege distinct and different damages.").

Accordingly, the Court grants the defendants' motion to dismiss the plaintiff's unjust enrichment claim.

## IV. CONCLUSION

The Court finds that the plaintiff Pues Family Trust IRA, by Michael Pues, Executor of the Estate, has established, by a preponderance of the credible evidence, that a valid loan of $350,000 was made by the Pues Family Trust to both defendants, Parnas Holdings Inc. and Lev Parnas, which has not been repaid and is due and owing.

Therefore, judgment is rendered on behalf of the Pues Family Trust IRA against the defendants Parnas Holdings Inc. and Lev Parnas in the amount of $350,000, with interest from March 17, 2011 and the costs of this action.

The attorneys for plaintiff are directed to submit a proposed judgment on notice to the defendants within ten days of the date of this decision.

**SO ORDERED.**

Dated: Central Islip, New York
        October 20, 2015

                              _/s/ Arthur D. Spatt_
                              ARTHUR D. SPATT
                              United States District Judge